versus the Illinois Central. The appellant, Mr. Kurtz, for the athlete, Mr. Wilder, you may proceed. May it please the Court. Your Honors, my name is Mark Kurtz, and I'm here on behalf of the Illinois Central Railroad, the appellant in this matter. This case is brought to you on an appeal from a jury verdict in McLean County involving a former railroad worker whose allegation was that he contracted asbestos-induced lung cancer. The jury returned a verdict on behalf of the plaintiff, and that verdict was subsequently reduced for his contributory fault. I've brought forward to the Court, I believe, four simple, straightforward points on appeal, and I'd like to address them in turn. I will start with the itemized verdict. It is the position of the defendant, the appellant, that the trial court committed an abuse of discretion and reversible error by not submitting an itemized verdict in this case. Did you provide one? We did, Your Honor. We did. The verdict form that was tendered by and given by the court from the plaintiff had one single verdict for dollar amount, and we don't have an itemization. The verdict form tendered by defendants in this case echoed the instructions on damages that the court had given in other parts of the instructions from the 30 series of the API dealing with such things as loss of normal life, pain and suffering, and of course medical expenses, which would include both pecuniary loss and non-pecuniary loss. The elements of damages you can receive under the FVLA are wrongful death action, a one-count complaint, as this was. The statute is clear, 735 ILCS 5-2-1109 provides that itemized verdicts are mandatory, and cases have interpreted that the same way. I thought the trial court found that your verdict form didn't have an itemization for wrongful death. I think that, in fact, was conceded, as I understood it. If you look at the plaintiff's brief, I don't believe that it was conceded. I think what was discussed is that it was a difficult situation to put all of the elements in there that the evidence supported. I don't know that anything was conceded because, frankly, Your Honor, pain and suffering is an element of a wrongful death claim, as is loss of normal life. We think wrongful death was properly instructed on and properly itemized in our two verdict forms that were tendered to the court. I don't believe that any discussion got to the level of a conclusion that it had not been properly tendered. There was some disagreement between the parties, of course. I don't believe that the defendant has failed to properly tender a correct form. It's our position that the statutory language makes it mandatory. The word shell is contained within the very language of 1109, and shell has been interpreted by the Fifth District in the Henderson case to show it is plain language of the statute. It should be itemized. Shell is to be given a mandatory interpretation by courts, and the legislative history tells us that. Without such language in an itemization verdict, without an itemized verdict, we don't have any way to attack or argue and appeal about the sufficiency of the verdict or the insufficiency of the verdict from a plaintiff's standpoint if that were to happen. Case law has interpreted that it should be. In fact, it's my position. I don't think the court had even discretion. The court has to give an itemized verdict when you're claiming economic and non-economic losses, personal injury damages in a case such as this. The case law cited by the appellee in their brief is easily distinguished from this case. In every instance, the first two cases, Merrick and People v. Tannenbaum, involved situations where the opposing party did not object to the non-itemized verdict. That didn't happen here. We clearly objected to it and did not tender a proper form or didn't tender any form for that matter. The third case cited by the appellee is the Wheeler case, and in that case there was a lot of different defendants, multiple defendants, multiple counts, and the verdict forms tendered didn't go anywhere near covering all the different theories and all the different parties in the case. What we put to the judge in this case, to the trial court, in our instructions, Verdict Forms 19 or Defendants 19 and 20, Verdict Forms A and B from the IPI, contained the three elements that were at issue in this case, loss of normal life, pain and suffering, and loss of medical expenses, both pecuniary and non-pecuniary damages. That instruction should have been given in our view. Without that, we have no way to address how the jury came out in terms of medical expenses, pain and suffering. We have no way to attack the sufficiency of a verdict on appeal. That's one of the things the Henderson Court from the Fifth District told us. The language, you want itemized verdicts so that on appeal, successful challenges can be made if damage awards are inappropriate. That's obviously a policy issue that the courts have instructed upon under 1109. Turning to the next issue that I think is of equal importance in this case, involves the lease. Where is pecuniary loss included in your tenured instruction? The word pecuniary does not occur there, Your Honor. I agree with you on that. It is our position that pecuniary would include, pecuniary is obviously a hard damage, medical expenses, and that is certainly part of the wrongful death, one count of complaint in this matter. If there are any additional, I'll move to the lease unless you have an additional question, Your Honor. The lease issue in this case, it is the, to give you folks a little bit of background, I understand you're probably familiar with the Anarco facility in Bloomington, Illinois. The rail yards and this rail company, it's our predecessor, GM&O, the Illinois Central's predecessor, owned a building. In the late 40s, they no longer had a need to use that building, and so the city of Bloomington, losing a bunch of jobs because the railroad was no longer going to occupy it, needed a tenant, and they got a chance reaction together, had the railroad go out and essentially acquire another tenant to put in that building to keep the job flow coming. And of course, that tenant turned out to be Anarco. In this case, evidence was introduced at trial, and it's our contention that it was irrelevant and extremely prejudicial that the railroad was in fact the leaseholder, the landlord of that facility, that building. And testimony, several documents were admitted, and testimony went on through corporate witnesses, asked about these lease documents, basically reading them to the jury. The problem is that that created an issue, or created an inference in the mind of the jury, that the railroad somehow, as the landlord, controlled what Anarco was doing. We all know about Anarco's conduct being deplorable in terms of their hygiene practices, and I believe the jury could well have imputed that to the railroad. And let me back up here. There's no doubt that under the FDLA, the statute in play here, that the railroad has a non-delegable duty to provide a reasonably safe place to work. That's absolutely correct. And I think the plaintiffs can argue, and did argue, as much as they care to, that the railroad should have taken steps for this dust blowing over from Anarco into the rail facilities, their neighboring facilities, that the railroad should have instituted respirator programs, cleaned up the premises better, taken whatever steps necessary. But the problem with the lease is, again, it creates the inference in the mind of the jury that there was control over Anarco. We cited landlord-tenant law, and the plaintiffs candidly admit, the appellees admit,  but we cited the law so the court can obviously understand that portion of the law. As a conveyance of property, once it's conveyed, the railroad has no further duty. Well, was it argued to the jury that the owner had control? Absolutely not. Appellees stayed away from that per the instructions of the trial court. But the problem, in our view, that the problem isn't cured. Obviously, the tenant is responsible for whatever goes on at the facilities. Negligent maintenance, negligent control, negligent emissions, in this case, would be what we're dealing with. The arguments given to the trial court when we argued this in motions and limine as to why the lease should come in from the plaintiff's perspective was notice, the purpose of notice, showing two things. First, that the railroad knew asbestos was dangerous and hazardous and toxic. I submit to you, your honors, that evidence came in constantly in this case from a variety of sources and documents. There was no need here. Second, that the railroad knew YNARCO was going to be engaged in a practice involving manufacturing asbestos products. I submit to your honors, it's a very obvious premise. The name of the company was Union Asbestos and Rubber. I don't think there's any doubt that the railroad knew what YNARCO was going to do, and I don't think a lease document helps establish that in any way. The problem, if you look at plaintiff's brief on page 8, the appellee brief, what they actually said was, the theory in the case as to the railroad was, the railroad was negligent in allowing massive quantities of dust to flow from YNARCO. The key word there, at least in our view, is allowing. They didn't necessarily argue that to the jury, but that was their theory, allowing connotes control, connotes that the railroad could have done something. We all know, under landlord-tenant law, the railroad couldn't have stopped YNARCO. YNARCO wasn't engaged in illegal activity. It had every right to manufacture products. This is the 1950s, so there weren't any regulations from EPA or OSHA on what they could and could not do vis-a-vis asbestos emissions. And so the problem is that the plaintiff wanted to impute the conduct of YNARCO to the railroad by just having this long discussion of the lease documents and the wrongful conduct of YNARCO was well established in this case. Their horrific hygiene practices, their environmental impact, there was a dust count study admitted that showed huge levels of asbestos and there was testimony to support that it blew over to the rail yards. There simply wasn't any need to instruct, to allow the jury to know that we, the railroad, were the landlord. You could have had all that evidence in about dust blowing over, but the landlord-tenant issue, the fact that they were the landlord, had very little probative value and the prejudice is extreme in this case. There's no way I can demonstrate the prejudice with what happened. We don't have an itemized verdict. We don't know, but I think it's an obvious situation that would have impacted the railroad in this case. They were the owner of the building, was the facts given to the jury. One other issue, going back to instructions I wanted to raise on appeal with this court, is the issue of the instruction on aggravation. It's our position that the trial court committed reversible error in instructing this jury on aggravation pursuant to IPI 160.27. This court is well aware that giving an instruction on aggravation is inappropriate when there's no evidence to support such an instruction in the record. It's our position that there wasn't any evidence in this case. I'll remind the court that this gentleman was suffering from asbestosis and lung cancer, which he claimed was caused by asbestos exposure. He also had other medical conditions, including a form of leukemia, hypertension, and prostate cancer. None of those were, of course, aggravated in any way by asbestos inhalation. There was no testimony offered by plaintiff that any physical condition he had when he joined the railroad in 1957 was aggravated by inhaling asbestos for his 30-some year career at the railroad. Nothing aggravated. In fact, the asbestos created a new condition, was the theory of the case, resulting eventually in his asbestosis and lung cancer. You've seen, of course, this court has written on this issue, not in the FALA context, but in the Fweet case, which was in our brief from 1994, where the court said, look, if there's no evidence that there was an aggravation or that there was no evidence that the defendant's conduct or negligence did anything to worsen the condition, then such an instruction shouldn't be given. The argument you hear from the appellee in this matter is that smoking. The man was also a smoker, and he started smoking about the time, or maybe a year or two before he joined the railroad. I'm not going to get into the discussion of synergy, but there is medical literature to support those two substances together in sufficient quantities can result in cancer. But I'd submit to this court that smoking is not a preexisting medical condition. Smoking is a health habit. Smoking is a, well, not a health habit, it's just a habit. The fact that the gentleman smoked, there's no testimony in the record that he had any disease from smoking in 1957, and medical science would tell us he couldn't have. It takes a while for smoking to develop. The preexisting condition by the very nature of the term, preexisting, has to preexist the negligence of the defendant. The claim is that the negligence began the day Mr. Lilienfeld set foot on our facilities in 1957. And there's simply no evidence, and that standard comes right from the comments to the instruction 160.27. There was simply no evidence in this case that smoking was aggravated, that it was a medical condition, that asbestos inhalation would have aggravated that condition. When you go back to the itemized verdict form, and the lack thereof in this case, it's difficult to demonstrate exactly what an aggravation may have done in this case. But we don't, aggravation is certainly part of loss of normal life. We don't have any particular way to assess what role aggravation played in this case, but it's an instruction that simply should not have been given. There is an argument in Apolli's brief as to waiver on this issue. We believe our post-trial motion stated in a very succinct and thorough fashion to the trial court, and then up to this court, of course, that we were claiming error in giving instruction 21, the aggravation instruction, for the reason that there was no evidence of any injury or damage resulting from an aggravation of a condition. I think that is a very concise statement of what the appellant was seeking on review or what the party bringing a post-trial motion. With that, Your Honors, the very last issue I have to discuss with this bench this morning is the issue of the failure of the court to grant judgment, notwithstanding the verdict in this case. And we understand that this is the FDLA. And, of course, the FDLA is a different arena. It does have a much more relaxed causation standard, as everyone knows. However, it is not strict liability. The law is clear that the same elements of negligence, damages, causation have to be proven. And it's our position that there was simply an insufficient amount of testimony as to the issue of dose. Dose to a toxic substance is critical in a toxic tort case, as I'm sure this court has dealt with in the past. Dose is a necessary finding by a jury in order to attribute a particular agent to an eventual disease. The McBride case, which was recently decided by the United States Supreme Court, indicated that, of course, reasonable foreseeability of harm is an essential element under the FDLA. And that's what we're talking about here with the concept of dose. And I would, as this court well knows, FDLA case law, FDLA has its own common law. So we can look to other states for substantive law. And that's one of the cases we cited here. But it is our position that the injury to which Mr. Lilienthal eventually contracted, asbestosis and then lung cancer to the extent it may have been linked, was not foreseeable. There was no evidence to the jury of dose, how much he was exposed to, no attempt by an expert or any other witness to quantify it. In fact, defense experts quantified it as a very minimal dose, but nothing to the contrary which would allow for such a finding. There's no evidence of any excessive level of asbestos dust in the rail yards such that would violate any then existing standard from the 50s all the way to the end of this man's career. In fact, there were some dust counts later in his career in his latter years in the 80s which showed compliance with the applicable standards that were in place at that time. No evidence to the contrary on that. No witness came into the court from an expert standpoint and said that the railroad did not provide a reasonably safe place to work, which is of course the ultimate issue, and that would have been based on exposure. We didn't have that testimony. And there simply wasn't any evidence to conclude that Mr. Lilienthal was exposed to asbestos in an amount that would make his injury foreseeable. There's anecdotal testimony of dust flowing over, but we don't have any idea as to the content, the duration, the intensity, the frequency with which he would have been around that dust. And I cited to the court a case from Virginia, the Supreme Court of Virginia, Norfolk Southern v. Rogers, and that case is similar, although it dealt with silica, but a similar type of agent. And in that case, the plaintiff obtained a verdict on a silica claim, but they never quantified the exposure to silica in that case through any expert testimony. They had an expert, but the silica was not quantified. The court looked at it and said, look, there's no liability for exposure to a dust where there's no evidence of what this dust cloud actually contained. It may have had some silica in it, but there was no specific evidence as to how much silica and at what levels of silica this generally was. Counsel, that case seems to support your position, but how do you reconcile it with the United States Supreme Court's case also involving Rogers, Rogers v. Missouri Pacific Railroad? Well, Rogers v. Missouri Pacific, of course, gives us the lessened standard of approximate cause, in whole or in part. And I do understand that. And I think the Rogers case from Virginia did a pretty good job of distinguishing that case. Causation has to be, it can be given at a much lower level, but it is our position that you have to have some testimony to establish the sufficient dose to the particular agent, silica, asbestos, whatever it might be, such that a proper jury verdict can be awarded, such that it could be determined that the plaintiff was exposed to an unsafe level, that a jury could actually make that inference. Yes, approximate cause is less, if the jury can look at it and say, yeah, we think it played some role, but they don't have any quantification here. We don't know what dust would have been present in any cloud at the railroad facilities. I would submit to this court, common sense tells us that at a railroad in the 1950s, you've got a lot of dust, sand, coal, road dust, ballast dust, and there was testimony in this case about that. And there may have been dust coming from Minarko. We don't know specifically what that dust was. It may have contained asbestos, but we don't know in what quantities or amounts. That's how you, I agree that Rogers makes the standard lower. Rogers from the Supreme Court, it does. But I think Rogers from Virginia allows the railroad,  It's difficult to quantify in exact terms, but it has to be given some form of quantification such that a jury can make a reasonable conclusion on exposure. With that, Your Honors, I don't have any further comment at this time. I see my time is almost up. No questions. Thank you. Thank you, Your Honors. Good morning. Jim Wilder for the Lilienthal family. We're asking you to affirm, and I'd like to follow up on some of the things Mr. Kerr has said. I've known him for 20 years when we get along, but part of what he just told you was inaccurate. Pecuniary loss was nowhere in the instruction that they tendered. Their very form was only for the types of damages that Jake had during his lifetime, pain and suffering, loss of a normal life, and his medical expenses. The FELA Act provides for wrongful death damages, and, in fact, both sides submitted a version of 160.15. That's IPI 160.15. It's the one that lists out money, benefits, and services. You can consider that in determining pecuniary loss for wrongful death, money, benefits, and services in, I think, three different ways, and then also his industry, health, sobriety, and thrift, and that's the damages returned for wrongful death. Plaintiff, we each tendered one. There was a difference in terms of one paragraph. Judge Lawrence made a ruling, and I gave an 18A that took out the one paragraph, and that was tendered, so the jury had instruction about returning damages for wrongful death. We tendered Plaintiff's instruction 26, the one about life expectancy. If you find that there was wrongful death, and there was no objection from the railroad. If you find injuries for wrongful death, you may consider how long Jake would have lived and consider how long the survivors would have sustained damages. So there were wrongful death throughout the instructions, and the verdict form they tendered didn't have that, and that's why I objected, saying there's no blank for pecuniary loss, no blank for wrongful death. This itemized form is incomplete. Counsel, it seems that the statute requires the itemization, which they submitted, but they didn't include the wrongful death. Your form included it, but didn't have the itemization. It's just odd why the trial court didn't ask the two of you to submit a new instruction that satisfied both the itemization and the wrongful death. Well, I think the trial court was persuaded in part by my argument, it's tough to itemize the wrongful death under the feel of one, and in fact that's what he didn't weigh, but Mr. Kurz said at the instruction conference, I agree it's difficult. I've seen it attempted, but it's very difficult to try to itemize this. I don't think the instruction is of much use to us. That's almost a verbatim quote from him. The court said it was going to allow for instruction. The instruction was given without the itemization. Verdict form B is theirs. They came back the next day with a verdict form B that didn't itemize. It is tough. How do we evaluate whether the award was supported by the evidence without itemization? It makes it more difficult, but the issue is whether there's been waiver, and this court is familiar with waiver, and this court need look no further than a prior decision of this court, Wheeler v. Sunbeltel, two of which we cited. It happens to be a case that my ex-partner and I did 20-some years ago. We cited Wheeler v. Sunbeltel. It's by Justice McCullough joined by Justices Spitz and Green. In that case, the plaintiffs didn't provide for all the findings, and then plaintiff appealed saying there was no itemized verdict form, and this court said verdict should cover all possible findings by the jury, citation. Plaintiff did not offer amended verdict to correct the defect. Failing to tender a proper itemized verdict to the trial court raves review of the issue. That's what this court has said, and there is no proper itemized verdict form here. Plaintiff was suggesting a general one, and the railroad, for whatever reason, I think I know the reason, which is at the start of the case, they were trying to claim there wasn't evidence of money, benefits, services, goods, that Jake would have contributed, but as we went through the case, I mean, he drove Jay and his wife everywhere. He did all the work at the house. They lived on his pension and so on, and they had a son who had never been able to work after he got out of the military, so there was clearly, you know, things that fit within the feel of, and that's why I think they weren't objecting to our instructions, but I don't know if they thought they were going to preserve error by refusing to submit on wrongful death. They don't bring it up on appeal, but at any rate, it wasn't tendered, and if you don't tender, and it's not just Wheeler. Mr. Merrick says the same thing, but Wheeler is from this district. If you fail to tender a proper itemized verdict to the trial court, then you waive review, and that's what we've said occurred here. So that's the itemized verdict. Now, on the lease, unless there's a question on that, on the lease issue, we didn't go over the line. Judge Lawrence said, I'm going to let it in for notice and knowledge, but you're not going to suggest responsibility, and as Mr. Kerr said, we didn't suggest that. I told the jury in openings, it's at page 19 of the June 13 transcript, that no one is suggesting the railroad could stop Union Asbestos from using asbestos because Union Asbestos, you know, they had the right to do what they wanted in their factory, and that was what we told throughout the case. No one was suggesting there was some landlord obligation. He said, well, I think it's shown here at page 8 of plaintiff's brief where they use the word allowed, and again, with all respect to counsel, what we said at page 8 of our brief was it was our position the railroad was negligent in allowing massive quantities of asbestos dust, which it knew was harmful to humans as far back as the 1930s, to permeate and flow freely through its yards and shops without offering any warning or protective devices to workers. In other words, that's why the lease comes in, it's shown notice, and our theory was they knew what was coming out of the asbestos factory was asbestos, and I'll talk about the lease exhibits in just a second. They didn't tell their people, warn them that the cloud's coming over. There was testimony from two individuals, it mounted up on the cars. There's testimony from one guy, some of the workers blew off their cars because of the fibers that looked like a skip of snow, depending on where you parked in the yard. They didn't tell them it had asbestos in it, and they didn't offer them respirators. No one suggested, and it's the same thing I told the jury. Nobody's saying they should have went over and put up, you know, said stop that. But since they knew it was harmful and knew it was coming, they could have at least given the workers respirators. They could have attempted some sort of, I guess, ventilation to combat it coming into the buildings. But the easiest thing would have been respirators, and the second thing with that would have been to tell the railroad workers, that building over there, that asbestos factory, this dust that's accumulating on the machinery, your windshield, your seats of your cars, it's harmful, and we know it's harmful. The lease, it's actually exhibits concerning a lease, one of them is 153I. It's a transcript appearing from December 11, 1950. And the way it worked was the railroad yard started in Bloomington because Bloomington basically donated some land, if you will, with the understanding the yards would continue to employ people there. It was an employment situation. We get to post-World War II, and the GM&O says, we don't need as many people working in Bloomington, but before we can lease out buildings, we've got to get approval from the city, as well as other interested parties. And so the GM&O filed a petition, it's one of the exhibits, and there was a hearing on it, December 11, 1950, and that transcript, the individual from the GM&O, the superintendent of the Eastern Division, which the railroad's corporate representative at Trow agrees was higher up, he would have known what the railroad had known for 15 years at that point, which was asbestos was hazardous and asbestos was toxic. The railroad admitted they knew in the mid-'30s, or people at Trow admitted, based on the documents, they knew by 35 that asbestos was harmful, that the guy who testified, Bodie, says they'd done a detailed inquiry into the operations of the railroad. He was asked by Mr. Livingston, an older gentleman, we'd done a detailed inquiry into, or he probably wasn't old back then, but detailed inquiry into the operations. They will make asbestos insulations of all sorts. And he's even asked by Mr. Livingston, have you made an inquiry as to whether it will emanate odors or things of that nature? And he says, I have. And the question is, will it? And the answer is, there will be no odors. So they knew asbestos was going to be used. They knew asbestos insulations were going to be used. And they were asked, would it emanate odors? And they said, no. And this is 15 years after they admit they had knowledge. And the reason they claimed they weren't telling workers is they were worried publicity would lead to claims. There's evidence of that, documentary evidence from 1937, that they said publicity, don't put it on the bulleted board because publicity could lead to the making of claims. That's a recommendation by the general managers of railroads in Illinois. The IC was present. The IC is the company, GMO wasn't there, but the IC was present. The IC exposed Jake and Paducah in the 70s without telling them, is the evidence. And so it came in for those reasons. We never, ever suggested. They don't cite anywhere in their brief that we try to say they should have stopped Enarco or they were responsible for Enarco. But they did have a duty to provide a reasonably safe workplace. If, I don't know this building, but if I'm being exposed to something, if I worked here, if he's being exposed to something and you know it and know he doesn't know it, then even if it's because it's coming through the windows from whatever's over there, the Illinois Secretary of State Police's building, you'd have under FELA a requirement to, I suggest, inform him and give him some protection. You may not be able to stop that building from doing what it's doing, but when you know it's coming into your workplace, I used the example, I think a trowel is a bad example, but if lava's coming down the hill, it's no excuse to say, and the workers can't see it's lava, it's no excuse to say, well, we didn't create the lava, we can't control it, you know. So that's why the lease was relevant, and there's no suggestion that we stepped over what the court said we should in terms of discussing it. Aggravation. To me, this is a classic case for aggravation. Everybody agreed there's synergism between the smoking and the cigarettes, that if you're a smoker, it's 10 to 11 times higher for lung cancer. If you're not exposed to asbestos, if it's asbestos, it's five times. If you're not a smoker, put them together and it's 53 to 92. And Jake was smoking. I think we ended up determining he was smoking before he started. He smoked throughout the time he was working for the railroad. And did he have injury from smoking when he started that he knew of in 57? Probably not, but he developed emphysema and similar things as he went along. He continued to be exposed, not just in the 50s, but the 60s and the 70s. In fact, there's some suggestion even into the early 80s. And that increased his risk of getting the very disease that's at issue, and their experts, our experts, all agreed on that, that there was an aggravation. The one aggravates the other. That's synergism. That's the definition. Judgment in OV. Again, it's a lesser standard. And in fact, and again, this record reflects that their corporate representative, their retained expert, a guy out of upper Michigan, an industrial hygienist that they'd educated with their documents, their industrial hygienist who worked for them, a guy named Burton, corporate representative was Garrett, all agreed the railroad knew by the mid-30s that asbestos could be harmful, knew it could be toxic. Two of the three agreed. It was established by 55 asbestos caused cancer. And in 1958, the IC had a consultant, a doctor, speak. At a gathering where he said asbestos is very well proven to be a carcinogen, and then he went on to talk more about smoking, which was still up in the air. That's 1958. It's Exhibit 166. Jake was being exposed then and continued to be exposed for pretty much 20 more years and was never warned. So yes, they clearly had the knowledge. I don't think when I get done and Mr. Kurz gets back up here, he'll suggest anything different than they had the knowledge, and that's why they say, well, let's go then for the idea of dose. This isn't Holloway. This isn't asbestosis. This isn't testimony that it takes a lot. From the plaintiff's side, the testimony is there is no safe level in terms of a carcinogen. We had testimony from Dr. Hauser who examined Jake during his lifetime and who opined that it was a combination of cigarettes and the asbestos. We had testimony from Dr. Frank generally on the fact there's no safe level when it comes to a carcinogen. Sort of consistent with what this court said 30 years ago just about in Wehmeyer where when you're talking about cancer, it was mesothelioma that you mentioned in Wehmeyer, nobody really knows how little it can take. Same way, there is no safe level for cancer. Now that's our experts. There's exhibits. Exhibit 438, page 2 from the EPA, says every exposure increases the risk when it comes to lung cancer. Exhibit 116, people were questioning about the fact that OSHA said there is no level, no level below which clinical symptoms can appear. There was testimony every regulatory agency internationally or nationally says there is no safe level when it comes to a cancer. So in terms of the idea of dose, that's a separate situation from, let's say, silicosis. But in terms of dose, the railroad is saying, I guess, well, we don't know exactly what he was exposed to. It's anecdotal evidence. Anecdotal evidence is the best evidence in many ways. And there's questioning in this record, a document called the Helsinki Consensus, that says occupational history is the best history when it comes to things like this because nobody took dust counts back then. There were, it was recommended to the railroad industry in 1935, exhibit 165, that you take dust counts. The general manager's recommended in 1937 you have to do frequent analysis of the air to determine what amount you're being exposed to. The IC did its first dust count in the 80s. There's no evidence that GM&L ever did dust counts. Now, if you can't get the exact, and we've got testimony. Would these arguments be arguments you would make in response to what the holding was because I noticed you didn't address that. It is the argument, I guess, the response I would make. We responded about the idea of dose. I mean, silicosis is different than cancer. This court held Holloway asbestosis requires some level, I guess, or at least reference that. But asbestosis isn't an issue here. I mean, Jake had it, we say. They say he didn't, but it's lung cancer. And the record is replete with the idea there is no safe level. There is testimony. And again, this court has never required, I'm not aware of any Illinois court requiring that you have to have a numerical value on the dose. The Supreme Court in Thacker, this court in Thacker and the Supreme Court in Thacker in an asbestos case said that dust becomes part of what's in the plant. Thacker was the guy who worked in the building. Nobody's tried to quantify what the dose was. Nobody's quantified the dose in any of the cases we've brought to you numerically. Instead, it's been what is the history, the evidence of whether there was exposure. Here, we've got co-workers who said he was exposed. Jake gave a deposition before his death. Gave a deposition, and that was supplied to defense experts. The defense experts say, I presume he was exposed based on what he said. That's one of them is a model, A-M-A-T-O. I asked Hauser a hypothetical, and Hauser had gotten information from Jake because he saw Jake while he was alive about where he'd been exposed. In addition, we've got the co-workers at the railroad. We also have the YNARCO worker. I'm sorry, we've got co-workers at the railroad talking about YNARCO, about the dust coming over and settling in the car. We've got an ex-YNARCO worker talking about how he had to put a sheet on his passenger, or on his car, because he was a young kid and it was his first ever car, and he was trying to keep it clean. So we've got dose, and when there's no safe level for cancer, that's been enough for this court to affirm in Thacker. It's been enough for this court to affirm in other instances, and some of them have been reversed by Supreme Court, and it was enough for Supreme Court in Thacker. As far as frequency, regularity, proximity, duration, et cetera, this man worked his whole career for the railroad and was exposed for decades to asbestos products, based on his own testimony and that of co-workers. So as far as the idea that there has to be an exact numerical value before you can implicate it, that's never been the law here. And frankly, I don't think it's the law in very many places, especially when it comes to cancer, because they didn't take dust counts. And if you get me started on why they didn't, it's because they didn't want to go around and hang things from your collar and then not tell you why they were doing it. It could have led to questioning, but that's my view, why they failed to do what their own physicians suggested and their own general managers suggested for almost 50 years. I think I've covered all four of them. I just had one more question. We don't know how much the jury awarded for the wrongful death. We don't, or for any other element. Actually, if you look, we rarely itemize in these cases. That doesn't mean it's right. But here, with Thela and, again, the instructions that apply to death, it was going to be tough to itemize. The jurors admitted it's tough to itemize. I don't know if it helps much. And they submitted a form, which I assume for some tactical reason they decided they didn't want to put wrongful death in there. It was in the rest of the instructions. There was no blank for a jury to put down $1 for wrongful death, and that's why I objected. And they never came back with one. The next morning they showed up with one, and they stuck to their position, although they were not appealing on that. This is not civil conspiracy. This is not some exotic theory. This is an $89 million. It's a run-of-the-mill Thela case. It's a reasonable amount. The jury even hit Jake 40% on negligence. This is the kind of case that's tried around the country and has been for 30 years, and based on this record it should be affirmed. No questions? No questions. Thank you. Rebuttal? Your Honor, the only issue I'd like to address is this issue of the lease, and I will candidly agree with what counsel just said, that they did not violate the instructions of the court in terms of what they could say about the lease and what they couldn't. The issue was the court allowing the lease to be talked about in the first place. The example of the building next door to the Secretary of State Police, if you folks knew that dust was blowing over and harming an individual in this courthouse, you might have a duty under FELA, and that's probably right. But there's no evidence that you folks are also the owner of that building and had any type of control over that building, and allowing it in, I didn't hear anything in the argument that shows us why the lease was necessary. The fact that the railroad was involved in this, locating a new tenant, in fact the word I think was used, recruited a new tenant, adds to that inference. They found him, they put him in that building, and that building started producing this toxic dust. In fact, they would have had no duty to stop what was going on there, there was nothing incorrect or illegal about what UNARCO was doing. There simply wasn't any reason to put in that leasehold issue. They could talk about anything else from the dust blowing over, the testimony from the gentleman about his car being covered with dust, the testimony about parts of the railroad that had a skiff of dust on them. That's all fair game, and I think that was appropriately argued in this case. The lease doesn't have any probative value that I can see, to the extent it has any. The amount of prejudice, it's night and day under 403, it's a completely two different sides of the coin in terms of the amount of prejudice the defendant may have suffered. Two other things I wanted to point out again on the aggravation issue. Again, we don't have any evidence of an injury or a pre-existing condition that was there before the negligence was deemed to have started or claimed to have started by plaintiff in 1957. There is no injury at that point. Without such, the aggravation instruction isn't appropriate. And finally, to clean up the comment on the itemized verdict as to why the next day we tendered a verdict that was actually given with just the one blank, and the reason we had to do that is the court had told us what they were going to do at that point. This was verdict form B, which allowed for contributory negligence. Plaintiffs hadn't submitted that because they argued contrib shouldn't apply. The court said, I'm going to give contrib, and now you need to come back with a verdict form that follows this, follows my instructions, and allows for contrib. That's why that particular verdict form was finally given. Those are the only comments I have in rebuttal, Your Honors. Thank you. We'll take the matter under advisement and await the readiness of the next case.